# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKI BARBER,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1:10-cv-01432-AWI-SKO

**FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT**

(Doc. 1)

## INTRODUCTION

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C. §§ 405(g), § 1383(c)(3). The matter is currently before the Court on the parties' briefs, which were referred to the Honorable Sheila K. Oberto, United States Magistrate Judge.

## FACTUAL BACKGROUND

Plaintiff was born in 1964, has a high school education, and attended one year of college. Plaintiff previously worked as a nurse assistant, a licensed vocational nurse, and a travel agent. (Administrative Record ("AR") 26, 28, 37, 104, 155.) On February 21, 2007, Plaintiff filed an

application for DIB, alleging disability beginning June 1, 2005, due to fibromyalgia and problems with memory and concentration, skin problems, asthma, chronic right wrist pain, right de Quervain's tenosynovitis, left acromioclavicular sprain with chronic pain, osteoarthritis to the right knee, chronic pain to the right foot and left shoulder, and a bone spur in the left foot. (AR 23, 125, 144-45.)

**A.    Medical History**

On October 5, 2004, Plaintiff was examined by Dr. Teresa A. Schully.  Plaintiff reported that she fell at work in May 2004 and suffered severe pain in her right wrist, thumb, and the inside of the top of the forearm as a result. (AR 530.) At the time of her fall, Plaintiff was treated by Dr. Freeman at the Turlock Urgent Care, and a magnetic resonance imaging ("MRI") was obtained. (AR 530.) Dr. Schully reviewed the MRI report and discussed treatment options with Plaintiff including splinting, therapy, injection, and surgery. (AR 532.)  Plaintiff indicated that she would like to proceed with injection therapy, and she was injected with a mixture of Depo-Medrol and lidocaine in her right wrist. (AR 532.)  Plaintiff was instructed to follow-up with Dr. Schully in six weeks. (AR 532.)

In November 2004, Plaintiff was again examined by Dr. Schully. (AR 520-21.) Dr. Schully indicated that Plaintiff continued to suffer persistent right-wrist pain that was not responding well to conservative pain management. (AR 520.)  She recommended a bone scan and noted that there was no objective evidence of pathology.  Dr. Schully gave Plaintiff a "modified work note," and indicated that Plaintiff was limited in the use of her right hand: no lifting greater than five pounds, no pushing or pulling, only minimal vibratory work, and limited gross manipulation of the right hand. (AR 521.)

On January 19, 2005, Plaintiff underwent a bone scan of her right hand and wrist. (AR 516.) Dr. Schully noted that the results were within the normal limits, indicated that Plaintiff had no work restrictions, and referred Plaintiff back to full duty status. (AR 516.)  Plaintiff returned to work between February 2005 to June 2005, but her nursing position was ultimately terminated. (AR 426.)

In June 2005, Plaintiff was examined by Dr. Sanjay R. Patel for evaluation and treatment of her right wrist and forearm. (AR 351.) Dr. Patel noted that Dr. Schully did not find any orthopedic issues and sent Plaintiff back to work. (AR 351.)  However, Plaintiff expressed frustration to Dr.

1    Patel because she continued to suffer from worsening pain in her right wrist, radiating from her

2    thumb up into the forearm and biceps.  (AR 351.)  Dr. Patel recommended that Plaintiff undergo

3    electromyogram ("EMG")/nerve conduction studies because Plaintiff may have neuropathic damage

4    which Dr. Patel found difficult to ascertain without a nerve test.  (AR 352.)

5            In July 2005, Plaintiff began occupational therapy at Progressive Therapy Services, where

6    it was noted that she "did not appear to put out maximal effort with the right hand strength testing."

7    (AR 454.)  The treatment recommendation was to continue the therapy for eight weeks, two times

8    per week.  (AR 454.)

9            On examination in August 2005, Dr. Patel noted the following findings:

10           The patient comes in for a review and EMG/nerve conduction study done by Dr.
             Jeffrey Scott. The nerve study was normal.  This leaves me to believe that the patient
11           has more of a tendinitis, which also causes me concerns, as she has not had
             significant improvement despite her injury being over two years old.  She undergoes
12           occupational hand therapy with some improvement, but she still has loss of strength
             in her wrist.  She has a new wrist brace as well.  She continues to take Vicodin and
13           Soma as needed.

14   (AR 348.)  Objectively, Dr. Patel noted that Plaintiff's hand range of motion was full, she had some

15   tenderness to palpation in several spots, no swelling was noted, and her distal pulses and distal

16   sensation were intact.  (AR 348.)  Dr. Patel diagnosed wrist and forearm pain on the right side most

17   likely tendinitis, long standing.  (AR 348.)

18           In September 2005, Plaintiff was examined by Dr. Thomas K. Johnson; Plaintiff reported that

19   the edema in her legs had grown worse after flying home from Florida.  (AR 315.)  She stated she

20   was not able to avoid salt on the cruise she had taken.  (AR 315.)  He recommended compression

21   stockings and elevation of her legs to treat the edema.  (AR 315.)

22           On October 12, 2005, Plaintiff was referred to Progressive Therapy Services to complete a

23   Functional Capacity Evaluation ("FCE").  (AR 438-56.)  The results of the FCE indicated that

24   Plaintiff "should be able to eventually work at [the medium] Physical Demand level for an 8 hour

25   day according to the Dictionary of Occupational Titles [("DOT")]."  (AR 438.)  However, it was

26   noted that pain with repetitive use "remains problematic."  (AR 438.)  The FCE report indicated that

27   the testing caused Plaintiff increased pain and fatigue through the wrist area, and the active range

28

                                                      3

1    of motion in her upper right extremity was 8% below normal.  (AR 439.)  A Blankenship System

2    Reliability Profile was performed and the results indicated the following:

> Mrs. Barber demonstrated typical symptom/disability exaggeration behavior by our
> criteria, and she scored a 0/5 by Wadell's and a 1/21 by Korbin's protocols.  She
> passed 52/71 validity criteria during the FCE, 73%, which suggests fair effort overall,
> for the duration of the FCE.  Mrs. Barber was appropriate and cooperative for the
> FCE process.

6    (AR 439, 476.)

7        At a November 18, 2005, examination, Plaintiff reported pain under her right shoulder blade,

8    but Dr. Johnson found no injury or strain.  (AR 314.)  Plaintiff stated that it hurt to take deep breaths

9    or cough, but she otherwise was not in pain.  (AR 314.)  She also reported some episodes of

10   "probable low blood sugar."  (AR 314.)  Dr. Johnson noted that they discussed the urgency of

11   Plaintiff's need to lose weight in light of the future risk of developing diabetes.  (AR 314.)

12       On November 22, 2005, Dr. Patel reported that Plaintiff had permanent work restrictions due

13   to her right-wrist pain "of unknown etiology," she was limited in her ability to do repetitive overhead

14   reaching, pushing, pulling or lifting with the right upper extremity, and she was not to lift more than

15   10 pounds with her right wrist.  (AR 340.)  Dr. Patel also provided his opinion of Plaintiff's future

16   medical treatment:

> The patient has undergone aggressive conservative treatment with some
> improvement.  However, her subjective complaints are well in excess of what I could
> find on my objective findings.  As a result, I had a long discussion with her that if she
> was unhappy with the impairment rating, she was welcome to a QME evaluation
> panel.  In terms of medications, the patient should be continued on medications on
> an as-needed basis . . . She is not a surgical candidate and this has been ruled out, so
> no surgical follow-up is recommended . . . In addition, she should also be employable
> in some manner and do many of the aspects of her nursing career.

22   (AR 340.)

23       On January 20, 2006, Plaintiff reported to Dr. Johnson that she was having trouble falling

24   asleep and that over-the-counter sleep aides had not helped.  (AR 313.)  She reported increased

25   anxiety, an increased desire to stay at home because of fear of leaving the house, and increased

26   anxiety if she had to travel.  (AR 311.)  She was experiencing horrible bouts of diarrhea, and related

27   that she was having a difficult time finding a job.  (AR 311.)  She reported feeling more anger and

28   upset "for the slightest reason."  (AR 311.)

On July 12, 2006, Plaintiff was examined by Dr. Johnson and indicated that she was doing well except for some ongoing anxiety.  (AR 310.)  She indicated that she had experienced anxiety when stuck in an elevator during a trip to Reno, but otherwise she was keeping very busy and staying at home caring for her children.  (AR 310.)

On July 26, 2006, Plaintiff reported to Dr. Johnson that she had been staying at home for the past couple of weeks because of the extremely hot weather, and so "she has not been out in situations when she usually experiences anxiety."  (AR 309.)  He continued her prescription for Lexapro for another two weeks.  (AR 309.)

On September 8, 2006, Plaintiff reported to Dr. Johnson that she felt more anxious, particularly because she and her husband were going to be taking a trip that involved flying; she had concerns about whether she would be "able to handle this."  (AR 308.)

On September 20, 2006, Plaintiff reported to Dr. Johnson that she continued to experience difficulty sleeping, and that the Ambien prescription was not helping as much as it had in the past.  (AR 307.)  Dr. Johnson discussed with Plaintiff strategies for helping her gradually calm down before going to bed, including activities like reading, doing crossword or other puzzles, and watching television.  (AR 307.)

On October 3, 2006, Plaintiff was examined by Dr. Maureen D. Miner, a Qualified Medical Evaluator ("QME") for Worker's Compensation, concerning Plaintiff's complaints of pain in her right wrist and left shoulder.  (AR 458-74.)  Dr. Minor reviewed Plaintiff's medical history, including the reports and findings of Dr. Patel and Dr. Schully, and opined that Plaintiff has a disability of her right upper extremity most consistent with "a preclusion of no repetitive gripping, pushing, pulling or twisting."  (AR 470.)  With regard to Plaintiff's left shoulder, Dr. Minor opined that the disability is "consistent with no repetitive reaching above shoulder level."  (AR 470.)  Objectively, Plaintiff demonstrated a loss of grip strength in her right arm, a loss of range of motion at the right wrist, and there was evidence of dorsal hand/wrist soft tissue swelling and dorsal ganglion cyst.  (AR 471.)  Dr. Minor indicated that Plaintiff "is a candidate for injection trial into the point of maximal tenderness in the right hand, particularly the ganglion cyst."  (AR 472.)  Further, she "is a candidate for injection

into the AC ligament.  The patient does not prefer injection therapy, but these remain as treatment options."  (AR 472.)

On November 13, 2006, Plaintiff underwent an open MR arthrogram of the right wrist, i.e., a fluoroscopic injection into her right wrist followed by x-rays and an MRI.  (AR 356.)  The radiologist noted an impression of "[e]ssentially negative MR arthrogram of the wrist."  (AR 356.)

On November 14, 2006, Plaintiff followed up with Dr. Johnson and reported that the Xanax and Ambien together at bedtime were helping her relax and sleep better.  (AR 305.)  She reported she was careful with her diet and was trying to make changes in meals for the family.  (AR 305.)  Dr. Johnson discussed with Plaintiff the importance of diet in weight and disease management and reviewed strategies for weight loss.  (AR 305.)

On December 11, 2006, Plaintiff met with Dr. Patel to review Dr. Minor's QME findings and the MR arthrogram results.  (AR 327.)  Dr. Patel indicated that the QME recommended four physical therapy sessions for the right shoulder plus a right shoulder injection.  (AR 327.)  Plaintiff requested that the physical therapy and the shoulder injection be performed.  (AR 327.)  On examination, Dr. Patel noted that there was no swelling, hyperesthesia,[1] or dysesthesia.[2]  (AR 327.)  Her grip was noted to be 4/5, and her wrist extension and flexion were within the normal range.  (AR 327.)

On May 19, 2007, Dr. Johnson Moon performed a physical examination of Plaintiff.  (AR 360-66.)  Plaintiff's chief complaints centered on right-wrist pain and left-shoulder pain; she also related a history of severe arthritis in the bilateral knees and bilateral feet.  (AR 360, 362.)  She reported that osteoarthritis in her right foot makes it difficult for her to walk, stand, and bear weight.  (AR 361.)  She stated that she could do some housework, and is able to take care of herself, but it is difficult.  (AR 361.)  She also indicated that she pays bills at home, helps her children with homework, but she suffers from significant insomnia so she has "scattered sleep throughout the night."  (AR 361.)

---

[1] Hyperesthesia is defined as consisting of an increased sensitive, particularly a painful sensation from a normally painless touch stimulus.  Dorland's Illustrated Medical Dictionary 900 (3d ed. 2007).

[2] Dysesthesia is defined as a distortion of any sense, especially that of touch.  Dorland's Illustrated Medical Dictionary 584 (3d ed. 2007).

During the examination, Dr. Moon observed that Plaintiff appeared comfortable walking and in the seated position, she was able to transfer to the examination room without problems, and although reported pain, she did not appear to be in any discomfort. (AR 362.) Dr. Moon also reported that Plaintiff had a normal station and gait and that she could toe walk and heel walk normally. (AR 363.) On neurological examination, Dr. Moon found Plaintiff's motor strength to be 5/5, and noted that "[t]here was some give away weakness in the right wrist and left shoulder secondary to pain, however, she was 5/5 when giving full effort." (AR 364.) Dr. Moon determined that Plaintiff's de Quervain's tenosynovitis on her right hand appeared moderate in nature, she had good strength on manual testing, and there was no sensory deficit. (AR 364.) When her thumb was tested, Plaintiff reported pain but did not appear to be in any significant distress. (AR 364.)

Dr. Moon found that Plaintiff had left shoulder strain with possible impingement that appeared mild to moderate in nature. (AR 365.) She had full range of motion in her left shoulder, but she did have "some give away weakness on examination." (AR 365.) Dr. Moon noted arthritis at the knees and feet appearing moderate to severe in nature. (AR 365.)

Dr. Moon opined that Plaintiff could not be expected to stand and walk more than two hours in an eight-hour workday, and probably no more than 15 minutes to a half hour at one time. (AR 365.) He also determined that Plaintiff could sit without restriction, could lift 25 pounds occasionally and 20 pounds frequently with her upper left extremity. With her right upper extremity, so long as the use of her right thumb was limited, she could lift 25 pounds occasionally and 20 pounds frequently. (AR 365.) He also reported Plaintiff had postural limitations on bending, stooping, and crouching because of arthritis in her knees and feet. (AR 365.)

On May 22, 2007, Plaintiff underwent a psychiatric examination with Dr. Soad Khalifa. (AR 367-70.) Plaintiff reported to Dr. Khalifa that she had problems with anxiety that resulted in panic attacks and she struggled with insomnia. Plaintiff stated she does some shopping, her children help her with housework, she is involved with her children's swimming team, and she goes to church occasionally. (AR 368.) Dr. Khalifa found Plaintiff's concentration to be intact, and noted that her persistence and pace were good. (AR 369.) He assigned her a Global Assessment of Functioning ("GAF") score of 60 and diagnosed her with an anxiety disorder, not otherwise specified. (AR 369.)

He determined that Plaintiff is able to understand, carry out, and remember simple instructions. (AR 369.)

On June 12, 2007, consultative non-examining state agency physician Dr. L.V. Bobba completed a physical residual functional capacity ("RFC")[3] assessment based upon a review of Plaintiff's medical records. (AR 371-75.) He determined that she could occasionally lift 20 pounds, frequently lift as much as 10 pounds, stand, walk, and sit for approximately six hours in an eight-hour workday. (AR 372.) Dr. Bobba found that, although Dr. Moon found Plaintiff had limitations in her ability to stand and walk, this assessment was based mainly on Plaintiff's subjective statements because examination of Plaintiff's weight-bearing joints was within normal limits. (AR 395.) Dr. Bobba concluded that Plaintiff would be able to perform light work with restrictions of her upper right extremity. (AR 395.)

On June 22, 2007, consultative non-examining state agency physician, Y.C. McDowell completed a mental RFC assessment based upon a review of Plaintiff's medical records. (AR 376-78.) He found Plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions, but otherwise had only mild limitations. (AR 376.) He opined that, while Plaintiff did experience some psychiatric symptoms, she retained the ability to understand, remember, and follow simple instructions, sustained adequate concentration and persistence, maintained appropriate workplace social interaction, and was able to adapt to work place changes in routine. (AR 378.)

On October 24, 2007, Plaintiff consulted with Dr. Anthony S. Padula at the Northern California Arthritis Center. (AR 570.) Dr. Padula recommended various studies and x-rays. (AR 571.) In a report to Drs. Patel and Johnson, Dr. Padula indicated that some of Plaintiff's pain symptoms were caused by fibromyalgia. He indicated that "[o]ne of the main focuses [of her

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1    treatment] will be . . . correcting her sleep disturbance, which is being disturbed by her pain as well

2    as probably the bipolar aspect." (AR 571.)  He stated that he would see Plaintiff in two weeks to

3    review the "above workup and give further impressions."  (AR 571.)  On November 13, 2007,

4    Plaintiff underwent hand x-rays showing no significant bony, soft tissue, or articular abnormality.

5    The radiological impression was negative with no arthritis or erosive changes identified.  (AR 565.)

6    Plaintiff also underwent x-rays of her left knee; the results indicated mild osteoarthritis.  (AR 563.)

7    Plaintiff also appears to have undergone a series of blood tests on October 25, 2007.  (AR 567.)

8        On December 11, 2007, Dr. Robert B. Paxton, a non-examining consultative state agency

9    physician, agreed that, as to Plaintiff's mental functioning, she had intact concentration, persistence

10    and pace were good, and she retained the ability to understand, remember, and carry out simple

11    instructions.  (AR 413-14.)

12        On June 19, 2008, Dr. Alvin E. Neumeyer, a psychiatrist, completed a report indicating that

13    he had been treating Plaintiff since September 2007.  (AR 416.)  He diagnosed Plaintiff with bipolar

14    disorder and reported that Plaintiff's response to treatment had been poor.  (AR 416.)  He indicated

15    that she had a poor ability to follow work rules, relate to co-workers, deal with the public, use

16    judgment, interact with supervisors, deal with work stress, maintain attention and concentration,

17    remember and carry out complex instructions, behave in an emotionally stable manner, relate

18    predictably in social situations, and demonstrate reliability. (AR 417.)  He opined that she had a fair

19    ability to function independently, understand, remember, and carry out simple instructions, and

20    maintain her personal appearance.  (AR 417.)

21        On May 1, 2009, Dr. Neumeyer submitted a report indicating that his diagnosis of Plaintiff

22    had changed to major depression that was both chronic and severe.  (AR 633.)  His clinical findings

23    of Plaintiff included her flat affect and problems with concentration.  (AR 633.)  In his report, Dr.

24    Neumeyer indicated that Plaintiff's functional abilities had diminished; he found that her ability to

25    adjust to a job in every category was poor, with the exception of a fair ability to remember and carry

26    out simple job instructions.  (AR 635.)

27

28

**B.     Lay Testimony**

On March 8, 2007, Plaintiff's husband, Mr. Barber, completed an adult function report indicating that Plaintiff was able to complete some housework and some errands, she takes the children to appointments, pays bills, watches television, and has daily interaction and conversations with her family. (AR 165.)  Her sleep was described as restless, and he noted that she had difficulty putting on undergarments, stockings, and shoes with buckles. (AR 166.)  She had difficulty holding soap or gripping a razor; she had problems feeding herself and preparing food that involving cutting or opening containers. (AR 166.)  She prepares some meals, but they are generally simple; she performs some housework, including laundry, loading the dishwasher, and simple "picking up." (AR 167.)  She completes some shopping for clothes and groceries approximately once or twice a week for 3 to 4 hours if there is a break so that she can sit to rest. (AR 168.)

She regularly attends her children's swim practices between May and July, and she talks on the phone and visits with friends occasionally. (AR 169.)  Pain in her legs cause problems when she is standing or walking for more than 10 to 15 minutes, and she takes pain medications for this problem.  She cannot lift more than 10 pounds with her right arm.  She can walk approximately one to two city blocks before needing to rest. (AR 170.)  She wears a brace on her wrist since her accident. (AR 171.)

Mr. Barber also indicated that Plaintiff can follow instructions if the subject interests her, but otherwise she does not follow instructions well.  She suffers from claustrophobia and does not handle stress well. (AR 171.)  Her physical limitations have caused her anxiety for which she takes medication, but with only limited success. (AR 172.)  The medication affects her memory, concentration, and her ability to get along with others. (AR 172.)  The pain in her wrist prevents her from lifting anything of weight, typically around 10 pounds. (AR 172.)

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 63-74, 75-81, 89-99.)  On May 28, 2009, ALJ Michael J. Kopicki held a hearing where Plaintiff testified. (AR 21-62.)

### 1.      Plaintiff's Testimony

Plaintiff testified that she lives with her family and has four children, three of whom live at home with her. (AR 24.) She is 5'1 tall and weighs 224 pounds. (AR 26.) She recently lost 40 pounds without intending to do so because her appetite diminished due to treatment for a mental disorder. (AR 26.) She is ambidextrous, she drives only when absolutely necessary, and she has problems with memory and concentration. (AR 27.) She suffers sharp, aching pain all over her body, and prolonged activities aggravate the pain. (AR 28.) She does not do household chores because that activity worsens her pain; medication and lying down help relieve some of the pain. (AR 28.) Her medications cause nausea and sleepiness. (AR 29.) She suffers from diarrhea, asthma, and a skin condition. (AR 29.) Her rheumatologist recommended that she walk, but it was too difficult to walk as far as he prescribed. (AR 32.) She has difficulty lifting more than five pounds. (AR 33.)

### 2.      Vocation Expert Testimony

A vocational expert ("VE") testified that Plaintiff's past work as a nurse assistant was medium[4] and semi-skilled, but it was heavy as performed; her past work as a travel agent was sedentary and skilled. (AR 49-50.) A hypothetical person with the same age, education, language, and work experience as Plaintiff who is able to lift 20 pounds occasionally, 10 pounds frequently; stand and walk about six hours in an eight-hour workday; sit for six hours per eight-hour workday; understand, carry out, and remember simple instructions; sustain adequate concentration and persistence for simple routine instructions; maintain appropriate workplace social interactions; adapt to workplace changes and routine; **but cannot** perform repetitive gripping, pushing, pulling, twisting with the right upper extremity, and was precluded from repetitive reaching above shoulder level could not perform any of Plaintiff's past relevant work. (AR 50-51.) However, such a hypothetical person could perform light and unskilled jobs in the category of cafeteria attendant, filling and closing machine tender, and cashier II. (AR 51.)

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, [the Commissioner determines] that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

A second hypothetical person with the same age, education, language, and work experience as Plaintiff who is ambidextrous; able to stand and/or walk up to six hours per eight-hour workday; sit six hours per eight-hour workday; has no limitations with the left upper extremity in terms of lifting and/or carrying; **but who is limited** to carrying and/or lifting 10 pounds with commensurate limitations on pushing and pulling with the right upper extremity; and only occasionally stooping or crouching could perform alternative jobs in the category of cashier II.

A third hypothetical person with the same age, education, language, and work experience as Plaintiff who is able to lift 20 pounds occasionally, 10 pounds frequently; stand and/or walk about six hours per eight-hour workday; sit about six hours per eight-hour workday; but should only occasionally climb ropes, ladders, and scaffolds; no more than occasionally crawl; no more than occasionally reach above the shoulder level with the left upper extremity; no more than occasional gross handling or fine fingering with the right upper extremity; avoid concentrated exposure to dust, fumes, gases, and similar environmental pollutants; and is limited to simple, routine work activity **could not** perform jobs in the category of cashier II, filling and closing machine operator, but could work as a children's attendant, furniture rental consultant, and usher, which are all light and unskilled.  (AR 53-54.)

A fourth hypothetical person with the same age, education, language, and work experience as Plaintiff who has a fair ability to understand, remember, and carry out simple job instructions and is able to lift 25 pounds occasionally and 20 pounds frequently; but should only occasionally stoop or crouch; and **has a poor ability to do the following**: adhere to work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, maintain attention and concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliably could not perform Plaintiff's past work or any other work.  (AR 55.)

A fifth hypothetical person with the same limitations and abilities as the third hypothetical person except that this person was limited to standing and walking only two hours per eight-hour workday **could not perform work** in the categories of children's attendant, furniture rental

consultant, or usher, **but could perform work** in the category of call-out operator, which is sedentary and unskilled. (AR 57-58.)

### 3.    ALJ Decision

On December 28, 2007, the ALJ issued a decision, finding Plaintiff not disabled since March 1, 2006. (AR 17-28.)  The ALJ found that Plaintiff had the following severe impairments: de Quervain's tenosynovitis on the right hand, fibromyalgia, asthma, left shoulder strain, obesity, and an anxiety disorder. (AR 12.)  Based on these severe conditions in combination with the functional effects of Plaintiff's non-severe impairments, the ALJ limited Plaintiff to lifting a maximum of 20 pounds occasionally and 10 pounds frequently, standing and walking for six hours in an eight-hour workday, sitting six hours in an eight-hour workday, only occasionally climbing ladders, ropes, and scaffolds and crawling, only occasionally reaching above shoulder level with the left upper extremity, only occasionally performing gross handling and fine fingering with the right upper extremity, and no concentrated exposure to fumes, gases, and similar environmental pollutants. (AR 14.)  The ALJ also determined that Plaintiff retained the mental capacity to perform simple, repetitive work tasks.

Based on this RFC assessment, the ALJ determined that Plaintiff could not perform her past relevant work as a licensed practical nurse and travel agent. (AR 18.)  The ALJ also found that, because of Plaintiff's limitations, her ability to perform all unskilled, light work was eroded. (AR 19.) Thus, a VE provided testimony, as set forth above, regarding the types of unskilled, light work Plaintiff retains the ability to perform given her existing limitations. (AR 19-20.)  As the VE testified there was light, unskilled work that Plaintiff could perform given her limitations, the ALJ concluded that Plaintiff was not disabled under the law.

Plaintiff sought review of this decision before the Appeals Council.  On June 4, 2010, the Appeals Council denied review. (AR 1-4.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

### D.    Plaintiff's Contentions on Appeal

On July 30, 2010, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  Plaintiff argues that the ALJ (1) failed to provide legally sufficient reasons to reject

Plaintiff's testimony; (2) improperly assessed the weight of medical evidence; (3) improperly rejected lay testimony; (4) failed to consider the combined effects of Plaintiff's impairments; and (5) posed an inadequate hypothetical to the vocational expert.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering

his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

### A.    Weight of Medical Evidence

Plaintiff asserts that the ALJ improperly evaluated her mental impairments by rejecting the opinion of treating psychiatrist Dr. Neumeyer.  (Doc. 16, p. 7-11.)  Specifically, Plaintiff notes that Dr. Neumeyer determined that she had a poor ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, maintain concentration, understand complex instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  (AR 417.)  Plaintiff asserts that the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Neumeyer's opinion.  The Commissioner asserts that the ALJ properly evaluated Dr. Neumeyer's opinion.  (Doc. 17, 12:10-14:27.)

15

1

### 1.      Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  *Id.*  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.  *Id.*  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.  *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 2.      The ALJ Provided Specific and Legitimate Reasons for Rejecting Dr. Neumeyer's Opinion

On June 19, 2008, and on May 1, 2009, Dr. Neumeyer completed check-box forms indicating that Plaintiff had a poor ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with stress, and maintain attention and concentration.  (AR 417, 633-35.)  The ALJ considered Dr. Neumeyer's opinion that Plaintiff has a poor ability in all requisite mental work-related abilities but gave the opinion little weight.  (AR 17.)  The ALJ reasoned as follows:

> Dr. Neumeyer's opinion is given little weight as it is not supported by the record.  The claimant only sees him every three months mostly for medication management at which time they discuss her memory and concentration allegations (testimony). However, as discussed above[,] the claimant performs a wide range of activities of daily living.  The record indicates that she has taken trips to Florida, Reno, and went

16

1    on a cruise, stays at home taking care of her kids, keeps very busy, and has a difficult
2    time finding a job (Exhibit 3F, pp. 4-5, 7-8, 12).
(AR 18.)

3    The ALJ determined that Dr. Neumeyer's opinion was not supported by the record, and

4    substantial evidence supports this finding.  None of the other medical evidence of record supports

5    Dr. Neumeyer's opinion regarding the severity of Plaintiff's functional limitations due to her mental

6    condition.  Specifically, the ALJ's decision noted the inconsistency between Dr. Neumeyer's opinion

7    and that of examining psychiatrist Dr. Khalifa, as well as the opinions of non-examining physicians.

8    The ALJ noted that Dr. Khalifa reported that Plaintiff's concentration during her mental status

9    examination was intact and her persistence and pace were good.  (AR 13, 369.)  Further, Dr.

10   McDowell opined that Plaintiff was not significantly limited in any area of mental functioning

11   capacity, with the exception of a moderately limited ability to understand, remember, and carry out

12   detailed instructions.  (AR 376.)  Upon review of the record, Dr. Paxton likewise agreed that

13   Plaintiff's concentration was intact, her persistence and pace were good, and she retained the mental

14   ability for simple, repetitive tasks.  (AR 413.)  Thus, as discussed throughout the ALJ's decision, the

15   weight of the medical record does not support the degree of functional limitations opined by Dr.

16   Neumeyer with regard to Plaintiff's ability to maintain concentration, attention, persistence and pace.

17   The fact that Dr. Neumeyer's opinion is contrary to the rest of the examining and reviewing

18   physicians' opinions, however,  is not, by itself, a valid reason to discount a treating physician.  All

19   things being equal, the ALJ is required to accept the treating physician's opinion over other doctors'

20   opinions where a conflict exists.  *See Lester*, 81 F.3d at 830-31 (explaining treating doctor's opinion

21   is entitled to the greatest weight).  However, the contrary opinions of non treating or non-examining

22   physicians may provide a portion of the basis for rejection of a treating physician's opinion.  *Morgan*

23   *v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) ("but we have consistently upheld

24   the Commissioner's rejection of the opinion of a treating or examining physician, based *in part* on

25   the testimony of a nontreating, nonexamining medical advisor.").

26   In addition to the medical record, the ALJ also explained that the Plaintiff's daily activities

27   supported an inference that she was not as limited as Dr. Neumeyer believed.  (AR 18.)  While Dr.

28   Neumeyer stated that Plaintiff had a poor ability to exercise judgment, concentrate, and maintain

attention, Plaintiff reported that she spends time caring for her children, she is involved in her children's swimming activities (AR 169, 368), she helps them with homework (AR 361), and her husband reported that she interacts with her family (AR 165), interacts with friends occasionally (AR 169), manages money (AR 165), and pays bills (AR 165). Plaintiff's capability to carry out these tasks supports an inference that Plaintiff's ability to use judgment and interact socially with others are not as poor as opined by Dr. Neumeyer and that Plaintiff is functioning at a higher level than he perceived. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999) (claimant's daily activities provide relevant basis for rejecting treating physician's testimony). The conflicting medical evidence combined with evidence related to Plaintiff's daily activities are specific and legitimate reasons supported by substantial evidence to give less weight to the opinion of Dr. Neumeyer.

Finally, the ALJ noted that Dr. Nuemeyer's examination reports indicate that his treatment of Plaintiff consists mostly of medication management and discussion of her subjective symptoms. From this reasoning, the Court infers that the ALJ found Dr. Neumeyer's opinion less valuable because the treatment records suggested his opinion about her mental abilities was based to a large extent on her own subjective reports of her condition which the ALJ properly determined were not entirely credible. *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (explaining that the ALJ need not recite "magic words," and that a reviewing court may draw inferences relevant to the ALJ's analysis of the evidence "if those inferences are there to be drawn"). This may constitute a specific and legitimate reason to discount a treating physician's opinion. *Tommassetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.") (citations omitted).

However, where the physician himself does not question the claimant's credibility and the findings are supported by the physician's own observations, rejection of that physician's opinion based on the claimant's lack of credibility is improper. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). Dr. Neumeyer's treating records (AR 576-80) are, as the Commissioner notes, "barely legible."   As a result, it is impossible to definitively determine whether Dr.

Neumeyer's findings were supported by his own observations.  Even assuming his findings were supported by his own independent observations of Plaintiff's behavior and presentation during examinations and treatment, the ALJ stated other valid reasons to reject Dr. Neumeyer's opinion.  Any error in this regard is harmless.  *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006) (noting ALJ's error is harmless if it is inconsequential to his ultimate disability determination); *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").

Plaintiff argues that the rejection of Dr. Neumeyer's opinion because he only sees Plaintiff every three months "mostly for medication management" is invalid.  Plaintiff states this is particularly so because the ALJ gave great weight to a consultative examiner who saw Plaintiff only once. (Doc. 16, at p. 9.)  The Court agrees that rejecting a physician's opinion based solely on the frequency of the examinations is not specific and legitimate.  *See Thompson v. Astrue*, No. ED CV 09-2255-PLA, 2011 WL 164323, at * 8 (C.D. Cal. Jan. 19, 2011) (rejection of treating physician's opinion because he had only treated the plaintiff for three months was improper); *Moore v. Astrue*, No. 08-cv-00320-WYD, 2009 WL 724056, at *7 (D. Colo. Mar. 18, 2009) (holding as improper the ALJ's rejecting of a treating physician's opinion on the basis that she had only treated plaintiff for four months).  To the extent that the ALJ rejected Dr. Neumeyer's opinion on this basis, it is not legally sufficient.  However, because other specific and legitimate reasons were provided for rejecting Dr. Neumeyer's opinion, including that Dr. Neumeyer's opinion was not consistent with the other medical evidence in the record and conflicted with Plaintiff's statements regarding her daily activities, any error in this regard was harmless. *Stout*, 454 F.3d at 1054; *Burch*, 400 F.3d at 676.

**B.    The ALJ's Consideration of the Combined Effects of Impairments**

Plaintiff asserts that the ALJ failed to consider the limitations that Plaintiff's fibromyalgia, obesity, left-foot bone spurs, arthritis, de Quervain's tenosynovitis in her right hand, chronic diarrhea, and asthma, either as individual impairments or in combination, affected her ability to function.

The ALJ found that Plaintiff's obesity was a severe condition, and stated that he took account of the impact Plaintiff's obesity had on her functioning in formulating his RFC assessment. (AR 13.) Plaintiff asserts that the ALJ did not adequately consider Plaintiff's limitations imposed by her

1    obesity.  She asserts that the ALJ instead "treated obesity as an adverse credibility factor noting the

2    importance of diet in weight and disease management."  (Doc. 16, p. 13.)

3         As the Commissioner asserts, however, there is no evidence that Plaintiff's obesity impaired

4    her ability to function outside the limitations acknowledged in the RFC assessment.  For example,

5    Dr. Moon noted that, upon examination, Plaintiff moved around comfortably and without difficulty.

6    (AR 362.)  She was able to travel to Reno (AR 310) and Florida (AR 315), which would require

7    substantial periods of sitting – particularly during airplane travel – thus, the evidence reflects that

8    Plaintiff's obesity did not impact her ability to sit, move, and travel.  No medical examiner or treating

9    physician noted any functional limitations based on or exacerbated by her obesity, outside advising

10   her of the "urgency of losing weight."  (AR 314.)  In arguing that the ALJ failed to consider the

11   effects of Plaintiff's obesity on her ability to function, Plaintiff argues that her obesity affects her

12   fibromyalgia, bone spurs in her feet, and arthritis in both knees.  Yet, no doctors who examined her

13   in relation to these impairments noted that her obesity was exacerbating these conditions.  There is

14   no substantial evidence in the record indicating that her obesity, alone or in conjunction with her

15   other impairments, caused functional limitation beyond that assessed by the ALJ in the RFC.

16        Plaintiff's conditions of fibromyalgia, chronic diarrhea, and asthma, were noted by the ALJ,

17   but were deemed not to functionally impair Plaintiff beyond the limitations assessed in the RFC.

18   (AR 15-16.)  Plaintiff asserts that the ALJ's analysis of her fibromyalgia ignored that Dr. Padula

19   diagnosed Plaintiff with fibromyalgia and found that a large degree of her symptoms was caused by

20   her fibromyalgia. (*See* AR 570-71.)  The ALJ, however, did discuss Dr. Padula's diagnosis and that

21   there were no clinical findings in his report to support the diagnosis – thus, the diagnosis alone did

22   not shed light on the degree of limitation Plaintiff suffered as a result of the fibromyalgia.  (AR 18.)

23   *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion

24   of any physician's opinion that is conclusory and brief and unsupported by clinical findings.").

25        The ALJ also noted that Dr. Padula recommended lab tests, x-rays of the hands, treatment

26   with Lyrica, light exercise and a small amount of walking, but that there was no evidence that

27   Plaintiff continued to be treated by Dr. Padula or that she followed his advice as to treatment;

28   moreover, the x-rays of her hands were negative.  (AR 18.)  Dr. Padula noted that fibromyalgia was

probably causing Plaintiff's difficulty sleeping. To the extent that difficulty sleeping is a functional limitation in and of itself, Plaintiff provided no testimony at her hearing that she is presently struggling with insomnia issues. Her husband noted that she was a restless sleeper, and there are various places in the record where Plaintiff related insomnia issues and Ambien was prescribed as a sleep aide, but there is no evidence that sleep difficulties caused Plaintiff functional limitations or that medication had not largely resolved this issue. Ultimately, beyond Plaintiff's testimony regarding her limitations which the ALJ found only partially credible, there is no other evidence to support the proposition that Plaintiff's fibromyalgia caused her functional limitation beyond that which was assessed in the RFC, and Plaintiff offers no argument *how* Dr. Padula's assessment establishes a limitation in Plaintiff's functionality.

Plaintiff's asthma was found to be a severe impairment, but did not impair her ability to function. Plaintiff testified at the hearing that she "only get[s] the asthma when [she's] sick with a cold," which occurs "[m]aybe twice a year." (AR 43-44.) When the asthma "kicks in," she has to avoid smoke of all kinds, fumes, and dust. (AR 44.) The ALJ incorporated a limitation into the RFC that restrict Plaintiff from concentrated exposure to fumes, gases and similar environmental pollutants. (AR 14.) In noting that Plaintiff had not been to the emergency room regarding her asthma, it appears that she was able to travel, which necessarily involves exposure to different kinds of potential allergians, but nothing she has been exposed to has caused extremely adverse reactions requiring hospital treatment. Moreover, the ALJ noted that she used an inhaler on an as-needed basis; thus there was an indication that the symptoms of her asthma were largely controlled by medication. Therefore, the RFC limitation to concentrated exposure to environmental pollutants adequately accounts for impairments related to Plaintiff's asthma.

With regard to Plaintiff's limitations based on her chronic diarrhea, she testified that she experiences diarrhea two to three times per week and as a result has to use the bathroom five or six times a day. (AR 42-43.) Each trip to the bathroom takes approximately 20 minutes. (AR 43.) Plaintiff's lay testimony, however, was determined to lack credibility with regard to the severity of her impairments. Although medical records establish that Plaintiff complained of diarrhea to various doctors (*e.g.,* AR 311), there is no evidence of the functional impairment it imposes outside her own

testimony, which, as set forth below, was not entirely credited.  Instead, Dr. Minor reported that, while Plaintiff was diagnosed with irritable bowel syndrome, it was managed with medication. (AR 429.) Plaintiff also testified at the hearing that she takes medication for the diarrhea which helps her. (AR 29.)  Plaintiff has not submitted evidence to demonstrate how this condition impairs her functional capacity beyond the limitations noted by the ALJ in the RFC. *See Matthews v. Shalala*, 10 F. 3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability.").

Plaintiff's physical impairments of bone spurs, arthritis in her knees and legs, and de Quervain's tenosynovitis and the impact these impairments have on Plaintiffs' ability to walk, stand, sit, reach above her head, and grip objects with her right hand, were all adequately addressed in the ALJ's consideration of the medical evidence relating to these conditions.  Plaintiff's left shoulder pain was considered by the ALJ and comprised the basis for the RFC limitation to only occasional reaching above shoulder level with the left upper extremity, which was supported by the opinion of Dr. Minor who expressed that the claimant should perform no repetitive reaching above her left shoulder.  (AR 470.)

With regard to any difficulty standing or walking as a result of Plaintiff's arthritis in her knees and feet, the ALJ discussed that, although Dr. Moon placed limitations on walking and standing, his conclusion in that regard was based on what he referenced as severe arthritis of the lower extremities, which was based on a history provided by the Plaintiff.  Later X-rays showed only mild arthritis in her knees, and thus the ALJ gave less weight to Dr. Moon's opinion in that regard.  The ALJ also noted that Plaintiff had normal station and gait on examination, and Dr. Minor noted that her bone spurs on the right were largely resolved following surgery (AR 429 ("She had a heel spur in the plantar fascial region on the right foot and status-post surgery symptoms had resolved.").)  Thus, the ALJ did not fail to consider Plaintiff's arthritis and bone spurs in formulating the RFC assessment.

Plaintiff also argues that her right-wrist condition was not adequately assessed because the ALJ disregarded Dr. Moon's opinion that Plaintiff might not be able to pick things up with her right upper extremity due to pain in her right thumb, and improperly disregarded Dr. Minor's opinion that

Plaintiff should not perform repetitive gripping, pushing, pulling, or twisting.  Plaintiff also asserts that the ALJ failed to account for Dr. Patel's opinion that Plaintiff had a limited ability to perform repetitive overhead reaching, pushing, pulling, and lifting with the right upper extremity, and opined that Plaintiff could only lift 10 pounds with her right wrist.

Contrary to Plaintiff's assertions, the ALJ expressly discussed these opinions and gave great weight to the limitations to which these physicians opined regarding Plaintiff's wrist condition and incorporated those limitations into the RFC.  With regard to Dr. Minor's opinion that Plaintiff should perform no repetitive gripping, pushing, pulling or twisting of her right upper extremity and no repetitive reaching above the left shoulder, the ALJ assigned "substantial weight in view of the objective evidence of record," and incorporated these limitations into his RFC.  (AR 17.)  As to Dr. Moon's opinion that Plaintiff has limitations using her right thumb (AR 365), the ALJ also assigned "substantial weight" to this portion of the opinion and incorporated a limitation for only occasional gross handling and fine fingering with the right upper extremity.  (AR 14.)

Finally, Dr. Patel's opinion that Plaintiff had a limited ability to perform repetitive overhead reaching, pushing, pulling, and lifting with the right upper extremity (AR 340) was assigned significant weight and was incorporated into the RFC with a limitation to only occasionally, as opposed to frequently or repetitively, climbing ladders, ropes,[5] and scaffolds, and crawling; Plaintiff was also limited to only occasional reaching above her shoulders.  (AR 14.)

Dr. Patel's opinion that Plaintiff could only lift 10 pounds was not given substantial weight by the ALJ because that opinion was not supported by Dr. Patel's clinical findings or by the FCE's determination that Plaintiff would ultimately be able to perform medium work as defined by the DOT.  Specifically, the ALJ noted that Dr. Patel's clinical findings described Plaintiff as having no

---

[5] Given Plaintiff's limitations for lifting, particularly with Plaintiff's right wrist, the ALJ's finding that Plaintiff could "occasionally" hoist her entire body weight hand over hand in an effort to climb a rope to be implausible and unsupported.  However, none of the jobs the VE testified Plaintiff could perform requires *any* climbing or crawling.  Therefore, even if the ALJ overstated Plaintiff's ability with respect to climbing ropes or ladders, such an error was not prejudicial. *See*, DICOT 349.677-018, 1991 WL 672889, "children's attendant," (climbing and crawling not activities or conditions that exists under job title), DICOT 295.357-018 , 1991 WL 672589, "furniture rental consultant," (climbing and crawling not activities or conditions that exists under job title), and DICOT 344.677-014, 1991 WL 672865, "usher," (climbing and crawling not activities or condition that exists under job title).)  Further, these jobs only require occasional or no reaching, handling, or fingering.

swelling, numbness of the wrist, an intact grip, and full range of motion. (AR 16, 327.) Further, the

FCE which Dr. Patel reviewed, did not indicate such a severe limitation and, in fact, indicated that

Plaintiff would be able to sufficiently recover to perform medium work. (AR 17, 439.) This was

a specific and legitimate reason to reject Dr. Patel's opinion in this regard. *Magallenes*, 881 F.2d at

751 (a conclusory opinion which lacks supporting clinical findings is a legitimate reason to reject

a treating physician's conclusions).

## C.   Plaintiff's Credibility

Plaintiff argues that the ALJ failed to provide clear and convincing reasons to reject Plaintiff's

statements as to the extent of her limitations. (Doc. 14, at 10-15.) The ALJ made the following

findings regarding Plaintiff's credibility:

> At the hearing the claimant testified in a somewhat stilted manner, at one point indicating that she had forgotten what she had written down in response to one of my questions. Considering her testimony in relation to the evidence of record, I find her allegations of disabling pain less than fully credible. As indicated, during the period under adjudication she has gone on trips to Florida, gone on a cruise (Exhibit 3F, pages 4 and 12), described herself as very busy staying home and taking care of the kids (Exhibit 3F, page 7), and indicated she was having a difficult time getting a job, which suggests she believed she could work (Exhibit 3f, page 8). Medical sources have struggled to find an etiology for her right wrist complaints, the diagnostic tests of records have shown mostly mild findings, her subjective complaints have been described as being in excess to objective findings, she has displayed "give way" weakness on testing (suggesting sudden loss of effort) and passed 52 of 71 validity criteria on her FCE suggesting fair effort overall (Exhibit 19F; 20f, pages 19-20). In view of her treatment history, the record does warrant work limitations, as found herein, but not to the extent alleged.

(AR 18.)

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must

engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ

must determine whether the claimant has presented objective medical evidence of an underlying

impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.*

The claimant is not required to show that her impairment "could reasonably be expected to cause the

severity of the symptom she has alleged; she need only show that it could reasonably have caused

some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets

the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony

about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (AR 20-21.) Therefore, absent affirmative evidence of malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing.

The ALJ offered several reasons for finding Plaintiff's statements regarding the severity of her limitations and symptomatology only partially credible. The ALJ considered the manner of Plaintiff's testimony at the hearing; compared her testimony to evidence in the record, including the medical records as well as her statements regarding her daily activities; and noted that certain records showed a "give way" weakness on testing, suggesting that she was not giving full effort in testing. For these reasons, while the ALJ found that the record warranted work limitations, Plaintiff's testimony regarding the severity of her limitations was not fully credible. (AR 17-18.)

### 1. Daily Activities

Plaintiff asserts that the ALJ "cherry-picked" statements regarding her daily activities that only appear inconsistent with her allegations of limitations when considered out of context. (Doc. 16, 17-18.) Plaintiff's brief refers to various medical records where she reported many problems to her physicians. The Court understands Plaintiff's argument to be that, while she may have taken a cruise, flown to Florida, traveled to Reno, and kept very busy at home caring for her children, she

was still reporting extreme problems with anxiety, diarrhea, pain in her wrist and left shoulder, and frustration.

The Commissioner cites *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005) in arguing that the ALJ permissibly considered Plaintiff's testimony in light of her daily activities.  Specifically, the Commissioner contends that Plaintiff testified that she got her children ready for school, prepared simple meals, did laundry, and paid the bills.  (Doc. 17, 20:6-7 (citing AR 38-40).)  Plaintiff's husband testified that she did some housework, took their children to appointments, paid bills, interacted with her family, drove, and did laundry.  (Doc. 17, 20;7-10 (citing AR 165-68).)

In *Burch*, the claimant provided testimony regarding her daily activities, which included watching television, performing light housework, seeing her boyfriend twice a week, sometimes taking care of bills, shopping, and traveling by bus.  400 F.3d at 679.  The ALJ considered these activities and determined that they indicated that the claimant was "quite functional." *Id.* at 680.  On appeal, the Ninth Circuit held that the ALJ was permitted to consider daily activities in his credibility analysis and, even if the daily activities may "admit of an interpretation more favorable to [the claimant]," the ALJ's interpretation must be upheld so long as it is rational.  *Id.* at 680-81 (citing *Magallanes*, 881 F.2d at 750).

Here, the ALJ's comparison of Plaintiff's daily activities with her allegations of limitation was rational.  While Plaintiff stated that she could sit for two hours (AR 42), stand for half an hour (AR 42), and she experiences diarrhea two to three times a week that requires five to six trips to the bathroom each lasting about 20 minutes (AR 42-43) as well as severe anxiety in places outside of her home (AR 311), her statements to Dr. Johnson in 2006 that she had flown to Florida (AR 315), gone on a cruise (AR 307-08, 315), and traveled to Reno (AR 310) indicate that, even if her symptoms are present, she is not precluded from activity that would require more than two hours of sitting, interacting with the public, navigating unfamiliar places and situations which travel undoubtedly includes, and managing her diarrhea symptoms, particularly on a plane flight where moving about the cabin or reaching a lavatory is not always possible.  The ALJ rationally inferred that these activities suggested that her limitations did not preclude her to the degree she testified.

26

Further, while traveling on vacation is not accurately characterized as a *daily* activity, the ALJ found that Plaintiff's routine activities at home also suggested a level of mental limitation not as severe as alleged. Plaintiff assisted her children in preparing for school in the morning and caring for their needs including helping with their homework (AR 38, 310, 361), prepared simple meals (AR 39), did laundry (AR 39, 167), and paid the bills (AR 165).

In sum, the ALJ's consideration of Plaintiff's activities in comparison with her stated limitations in finding Plaintiff not entirely credible was rational and supported by substantial evidence in the record. The Court cannot substitute its own or Plaintiff's interpretation of the evidence for the interpretation offered by the ALJ. "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas*, 278 F.3d at 954. Moreover, as set forth below, this was only one of the factors the ALJ considered in finding Plaintiff's testimony less than fully credible with regard to the severity of her limitations.

### 2.      Statements Inconsistent with Medical Evidence

The ALJ also found that the objective medical evidence did not support the degree of limitation to which Plaintiff testified. The ALJ reasoned that medical sources have struggled to find an etiology for her right-wrist complaints, the diagnostic tests of record have shown mostly mild findings, and her subjective complaints have been described as exceeding the objective findings. (AR 18.)

The Commissioner asserts that a conflict between the claimant's subjective complaints and objective medical evidence in the record is a specific and substantial reason that undermines a claimant's credibility. (Doc. 17, 18:21-19:11.) The Commissioner notes that Social Security Ruling ("SSR") 96-7 expressly states that an "adjudicator must consider such factors as . . . [t]he degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by the medical sources."

While an absence of objective evidence to support a claimant's degree of pain or limitation may not be the sole reason to discredit a claimant's testimony, it may be considered as part of the credibility analysis. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) ("an adjudicator may not

1   reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully

2   corroborate the alleged severity of pain").  Here, the ALJ's comparison of Plaintiff's testimony to the

3   objective medical evidence was within the bounds of this standard.  In other words, the ALJ based

4   his adverse credibility determination on more than simply a lack of objective medical evidence, but

5   instead considered Plaintiff's daily activities, the lack of objective medical evidence to support the

6   severity of the disability, and Plaintiff's manner of testimony at the hearing.

7         Moreover, review of the record indicates that substantial evidence supports the ALJ's finding

8   that the objective medical record lacks evidence supporting the level of severity alleged.  While

9   Plaintiff testified that she could stand for approximately an hour, sit for two hours, lift five pounds

10  with her right arm, and concentrate for an hour, Dr. Moon opined that she could sit for up to six

11  hours and stand for two hours.  (AR 365.)  Because of her right-thumb pain, she could carry up to

12  25 pounds occasionally and 20 pounds frequently, but was precluded from anything more than

13  occasional handling or fingering with her right hand.  (AR 365.)  Non-examining physician Dr.

14  Bobba confirmed Dr. Moon's assessment, but Dr. Bobba opined that Plaintiff could stand at least six

15  hours, which was longer than Dr. Moon had opined.  (AR 372.)  Further, Dr. Khalifi and Dr. Paxton

16  found that Plaintiff had intact concentration, persistence and pace and could perform simple tasks.

17  (AR 369, 413-14.)  While Dr. Neumeyer provided medical evidence that supported Plaintiff's

18  allegations with regard to Plaintiff's mental limitations and her ability to concentrate and complete

19  tasks, this evidence was afforded less weight by the ALJ for legally sufficient reasons.

20        Overall, the ALJ's finding that the medical evidence did not corroborate her statements

21  regarding the extent of Plaintiff's limitations is supported by substantial evidence in this regard.

22  Thus, the medical evidence in combination with consideration of Plaintiff's daily activities comprised

23  clear and convincing rationale to discredit Plaintiff's testimony.

24          **3.      Manner of Plaintiff's Testimony**

25        As part of the credibility analysis, the ALJ considered Plaintiff's manner of testimony at the

26  hearing.  The ALJ noted that "the claimant testified in a somewhat stilted manner, at one point

27  indicating that she had forgotten what she had written down in response to one of my questions."

28  (AR 18.)  Plaintiff asserts that "[f]orgetting a response to a question is not so unusual in the context

of [a] disability hearing, particularly when the claimant is alleging memory and concentration problems." (Doc. 16, p. 20.)  Plaintiff also asserts that the Ninth Circuit disapproves of "so called 'sit and squirm' jurisprudence." (Doc. 16, p. 20).   The Commissioner argues that "the ALJ was entitled to consider this observation that Plaintiff's demeanor was stiff and unnatural, and her answers were rehearsed, as a reason for finding her testimony not credible." (Doc. 17, 26:7-8.)

Although an ALJ's observations may not be the sole reasons for rejecting subjective complaints and testimony, SSR 96-7, at p.8, an ALJ may use ordinary techniques of credibility evaluation and may consider specific observations of the claimant at the hearing as part of an overall credibility determination. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  The ALJ appropriately considered his observations of the manner of Plaintiff's testimony at the hearing as a component bearing on her overall credibility.

### 4.      Medical Records Indicating only Fair Effort on Examination

In comparing the medical records to Plaintiff's statements about her limitations, the ALJ noted that Plaintiff exhibited "give way" weakness on testing and passed a functional capacity exam at 75%, which "suggests fair effort overall." (AR 439.)  As it relates to the FCE results, this reason is not a clear and convincing reason to discount Plaintiff's testimony.

The FCE examination results were reviewed by both Dr. Minor and Dr. Patel, neither of whom noted any concern regarding the validity of the FCE.  The FCE was not considered invalid by the therapist who administered it despite the noted symptom/disability exaggeration.  Further, Dr. Minor discussed the results of the FCE in an October 3, 2006, written report, but did not express doubt about Plaintiff's credibility on testing, and appeared to give the FCE weight in her analysis. (AR 463-64.) Finally, the ALJ gave "[s]ignificant weight" to the FCE results "despite what was described as fair effort with only 52 out of 71 validity criteria passed." (AR 17.)  Any error in considering Plaintiff's effort on testing,  however, is harmless because the ALJ stated other reasons that, in combination, amount to a clear and convincing basis to find Plaintiff less than entirely credible.

**D.    Lay Testimony**

Lay witness testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *see also Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010).  Lay witness testimony cannot be disregarded without comment. *Stout*, 454 F.3d at 1053.  In rejecting lay witness testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. *Lewis*, 236 F.3d at 512.  Germane reasons for rejecting a lay witness' testimony include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008); *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).  The ALJ also may "draw inferences logically flowing from the evidence." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

Plaintiff contends that the ALJ failed to provide specific and germane reasons for rejecting the testimony of Ross Barber, Plaintiff's husband.  (Doc. 16, p. 21-22.)  Defendant argues that the ALJ's explanation that Mr. Barber's observations were inconsistent with the preponderance of the medical evidence of record was a specific and germane reason to discount his testimony.  (Doc. 17, 22:19-26.)

The ALJ reasoned that Mr. Barber is not a medical professional competent to make "exacting observations as to dates, frequencies, types, and degree of medical signs and symptoms, or the intensity of unusual moods or mannerisms."  Mr. Barber opined that "the pain in [Plaintiff's] legs causes problems when she is standing or walking for more than 10 to 15 minutes," that Plaintiff can no longer lift over 10 pounds with her right arm/hand, and  that her physical conditions have caused her anxiety.  Mr. Barber is competent to testify that Plaintiff has made statements to him regarding her pain, e.g., that she claims it prevents her from walking or standing more than 10 minutes.  Mr. Barber is also competent to state his observations about the amount of weight Plaintiff lifts or she

avoids lifting, but he has no personal knowledge of her pain.  Mr. Barber is not competent to opine regarding whether Plaintiff's impairments medically prevent her from walking for a particular length of time or lifting a particular amount of weight, or that her physical impairments cause her anxiety condition.  As phrased, these statements constitute opinions that are beyond the competence of a lay person.  With regard to these statements, the ALJ's rejection is germane and specific.

This reasoning is not applicable to Mr. Barber's entire testimony, however.  Mr. Barber testified that Plaintiff performs some housework, runs some errands, takes the children to appointments, pays bills, and interacts with family.  (AR 165).  He stated that her sleep is typically restless, and she has difficulty falling asleep.  (AR 166.)  He noted that she has difficulty putting on garments, gripping a bar of soap or a razor for purposes of personal care, and has difficulty with certain aspects of food preparation such as cutting or opening containers.  (AR 166.)  These are statements that a lay person is competent to provide because they constitute reports of Plaintiff's observable symptoms.  Thus, to the extent these statements were rejected on ground that Mr. Barber was not competent to opine as such, that is not a proper reason to reject this particular portion of Mr. Barber's testimony.

Nevertheless, any error in this regard is harmless because the ALJ also rejected Mr. Barber's testimony as inconsistent with the medical records in the same regard as Plaintiff's reports and testimony.  As the ALJ's discussion of the medical record set out specific reasons that Plaintiff's testimony was not consistent with the medical evidence, the ALJ is entitled to reject a lay person's similar statements on the same grounds, so long as the rejection is express.

Finally, with regard to the ALJ's determination that Mr. Barber was not credible as a witness because he was biased as Plaintiff's husband, even assuming this was not an appropriate ground on which to discredit his testimony (*compare Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1298 (9th Cir. 1999) (fact that a witness is a family member cannot be ground for the rejection of his or her testimony) *with Gregor v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (ALJ properly considered that lay witness' close relationship with claimant impacted credibility)), there were two

other specific and germane reasons[6] in combination  that constituted a legally sufficient basis to reject Mr. Barber's testimony.

**E.      Hypothetical Questions Posed by the ALJ to the Vocational Expert**

Plaintiff finally maintains that the ALJ failed to credit the VE's testimony in response to the hypothetical that accurately reflected Plaintiff's limitations.  The Commissioner asserts that the ALJ properly assessed Plaintiff's RFC and included all of Plaintiff's limitations in the hypotheticals posed to the VE.  (Doc. 17, 23:10-24:7.)

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant.  *See Magallanes*, 881 F.2d at 756.  If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value.  *See DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole.  *See Embrey v. Bowen*, 849 F.2d 418, 422-23 (9th Cir. 1988).

An ALJ, however, is "free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001). Here, because the ALJ "was not required to incorporate evidence from the opinions of [Plaintiff's] treating physicians, which were permissibly discounted," Plaintiff's argument in this regard is unavailing. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 959-60 (hypothetical question need not include claimant's subjective impairments if ALJ makes specific findings that claimant is not credible).

---

[6] These reasons included that (1) Mr. Barber was not competent to provide exacting observations about dates, frequencies, types, and the degree of medical sings and symptoms or the intensity of unusual moods or mannerisms; and (2) Mr. Barber's testimony was inconsistent with the medical evidence in the same manner as Plaintiff's testimony.

1

**RECOMMENDATION**

2        Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

3 evidence and therefore RECOMMENDS that the ALJ's decision be affirmed.

4        These findings and recommendations are submitted to the district judge assigned to this

5 action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fifteen (15)

6 days of service of this recommendation, any party may file written objections to these findings and

7 recommendations with the Court and serve a copy on all parties.  Such a document should be

8 captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge

9 will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C.

10 § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

11 waive the right to appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

12

13 IT IS SO ORDERED.

14 **Dated:    February 9, 2012**                    **/s/ Sheila K. Oberto**
                                          UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28